## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

**JANE ROE** and **JOHN DOE**,

     Plaintiffs,

v.

**DAVID GOZAL**,
in his individual and official capacities,

     Defendant.

Civil Action No.: _____ 3:26-cv-00485

## **COMPLAINT**

1. This case is about a medical-school Dean who could not quietly push out a faculty rival, so turned his sights on the rival's children.

2. Defendant David Gozal, had tried to force the father out—stripping his titles, slashing his salary, dismantling his research program, and obstructing renewal of a multi-million-dollar federal grant the father had secured. But the father fought back, put the University on notice of legal claims, and—for a little while—saved his job. Unable to finish his campaign against the father, Dean Gozal turned to his children.

3. Despite Dean Gozal's persistent and targeted harassment, by the spring of 2026, those children—Jane Roe and John Doe, two Marshall University MD/PhD students (the "Students")—had done everything Marshall University told them to do.

4. They had rebuilt dissertation committees after Dean Gozal dismantled them. They had followed Marshall's written "Steps to Graduation" guidance. They

1

had completed newly-required committee paperwork, academic plans, and oral examinations, all tailored by Gozal to impede their progress.

5. They had met with medical-school administrators, scheduled clerkships, completed orientation, scrub training, FIT testing, BLS/ACLS certification, and electronic health-record training. They had finally begun their long-awaited transition back into the third year of medical school from the PhD program.

6. Then, after they were already inside the clinical curriculum, Dean Gozal pulled the floor out from under them again, and—at least as far as Gozal intended— definitively.

7. On May 6, 2026, the Students received letters from the Dean's office invoking a newly minted "Dean's Advisory Council for PhD/MD Transition." The letters said the Students had not met the "benchmarks" to advance. They had not completed the right tests. Their dissertations were not ready for defense. Their timelines were supposedly unworkable.

8. The punishment was sweeping: immediate suspension; termination of tuition support, stipends and insurance; permanent removal from the MD/PhD program; and only the possibility of petitioning later to re-enter as ordinary medical students—at the Dean's sole discretion.

9. It was a stunning move. Not because Jane and John had failed. They had not. It was stunning because everyone with actual responsibility for the MD/PhD program agreed that the Students had met every true requirement, and had already

treated them as students ready to return to medical school. The only person who seemed determined to stop them was the Dean.

10. Following the intervention of counsel, the May 6 decision was partially reversed, and the Students were reinstated. But by then, the Students had reason to know that when Dean Gozal wanted someone gone, the official explanation was only the beginning of the story. Dean Gozal had done this before—not just to their father, but to other students who dared to challenge him. Marshall knew it. Marshall did nothing to stop him. And Marshall is unwilling to protect the Students from the risk of more retaliation to come.

11. Marshall University ("Marshall") is a public university and an arm of the State of West Virginia, governed by the Marshall University Board of Governors. References in this Complaint to "Marshall" or "the University" describe the conduct of Marshall University, acting by and through its Board of Governors, officers, employees, and agents, including Defendant David Gozal, Dean of the Joan C. Edwards School of Medicine. Because Marshall is an arm of the State entitled to Eleventh Amendment immunity from the relief Plaintiffs seek in this action, Plaintiffs do not name Marshall University Board of Governors as a Defendant. Plaintiffs assert the claims set forth below solely against Defendant Gozal, in his individual and official capacities.

### Dean Gozal First Targeted the Students' Father

12. Before the fight reached Jane and John, it began with their father.

3

13. The Students' father had served at Marshall's Joan C. Edwards School of Medicine for more than twelve years. He had held multiple senior leadership positions. He had chaired a department. He had been a candidate for Dean. He had built the kind of research operation universities advertise when they want prestige, funding, and a higher national profile. He had garnered more NIH research dollars for Marshall than any other physician-researcher, and his efforts elevated Marshall's "Carnegie Classification"—a measure of research and academic prestige—to its highest level in history.

14. His signature achievement was the COBRE (Center of Biomedical Research Excellence) grant, awarded by the NIH. At Marshall, the COBRE grant supported obesity-related biomedical research—a topic of particular importance in West Virginia, whose citizens suffer from obesity-related medical complications at a high rate. It was an unprecedented multi-million-dollar federal award that benefited numerous researchers and elevated the University's research profile.

15. That is why, when Dean Gozal first attacked the father, the official rationale never made much sense.

16. In the spring of 2025, the University said COBRE funding was ending. It said the Department of Clinical and Translational Sciences—which the Students' father headed—was being eliminated. It said budgetary constraints required dramatic changes to the Students' father's employment.

17.   But the COBRE grant was not a drain on Marshall. It was one of Marshall's most valuable assets. And only a small fraction of the father's salary came from COBRE funding.

18.   In fact, the grant had not faltered; rather Dean Gozal actively obstructed efforts to renew it by interfering with laboratory space and preventing resubmission of the renewal application—despite broad support from administrators, faculty, and external reviewers.

19.   Then came the institutional squeeze.

20.   In plain contravention of the father's contract, Dean Gozal cut the father's salary by roughly two-thirds. He stripped him of his titles as Vice Dean for Research, Vice Dean for Graduate Education, and Chair of the Department of Clinical and Translational Sciences. And he ordered him out by summer.

21.   Further, Dean Gozal froze the father's cost-recovery account, withheld a clinical-trial incentive, and ordered him to give up independent VA effort-related salary and relocate federally funded laboratory operations to VA facilities that lacked the infrastructure needed for the work.

22.   This was not just a demotion. It was an effort to dismantle a career.

23.   The father had been in the running for the Dean's position, and faculty members openly remarked that the Dean's attack on the father seemed motivated by a desire to eliminate an influential rival. But personal animosity was not the Dean's only motivation. The father had also engaged in protected activity, reporting unauthorized and potentially hazardous radiological research involving human and

animal samples by another Marshall faculty member. Those reports implicated University policy, whistleblower protections, federal regulatory agencies, and federally funded research programs. They also threatened the Dean's job.

24. But when Dean Gozal moved against him, the father fought back. He put Marshall on notice of claims for breach of contract, discrimination, retaliation, and interference with federally funded research.

25. The father demanded restoration of his salary, titles, personnel, reporting structures, accounts, laboratories, research materials, equipment, and intellectual property. He also demanded that Marshall guarantee it would stop retaliating against him and his family.

26. Following a mediation, the father's claims against Marshall were "resolved to his satisfaction." But resolution did not mean restoration.

27. Marshall required the father to relinquish his tenure and allowed him to remain employed only through June 30, 2026.

28. Marshall also failed to restore the authority, institutional power, or the research platform Dean Gozal had taken. It rescinded the father's appointments as Vice Dean and Department Chair, relocated and restricted his research space, limited funded support for his research program, and required relocation and consolidation of his office operations.

29. Having only been partially successful in his attack on the father, the Dean's target shifted.

6

**Dean Gozal Turned the Children Into Pressure Points**

30.    Plaintiffs Jane Roe and John Doe are Children of Marshall, too.[1]

31.    Jane was a Daughter of Marshall. In 2017, Marshall accepted her into its competitive Accelerated B.S./M.D. Program. In 2020, it offered her a seat in the first-year medical school class.

32.    In 2022, after Jane had completed the pre-clinical medical-school curriculum and demonstrated significant research accomplishments, Marshall approved her transition into the combined MD/PhD program.

33.    Jane's offer came with tuition support and a stipend. The written conditions were clear enough: remain in good academic and professional standing, demonstrate continuous progress in the PhD research portion, maintain the required GPA, receive satisfactory thesis-committee reports, and pass the medical-school clinical portion of training.

34.    Plaintiff John Doe was a Son of Marshall. He entered the MD/PhD program in 2020 with the highest combined score for any candidate interviewed that year. His offer likewise included tuition support and a stipend, with similar written requirements.

35.    Nothing in either offer letter said Dean Gozal could later suspend their stipends, withdraw their tuition support, or remove them from the MD/PhD program because of requirements invented after the fact.

---

[1] Plaintiffs proceed under the pseudonyms Jane Roe and John Doe. Contemporaneously with this Complaint, Plaintiffs have filed a motion for leave to proceed pseudonymously, and Plaintiffs' use of pseudonyms herein is subject to the Court's ruling on that motion.

36.    But by May 2025, Dean Gozal's retaliation moved from the father to the children.

37.    The first target was the academic structure the Students needed to complete the PhD portion of the MD/PhD program: their dissertation committees.

38.    For Jane, that meant Dr. Soudamani Singh, an Associate Professor in Biomedical Sciences who had served for years as Jane's mentor and eventually as Chair of Jane's dissertation committee.

39.    Their relationship was substantial. Jane had long assisted Dr. Singh with research, publications, and academic work. They had co-authored papers and presented together. Jane had won two American Gastroenterology Association Student Abstract Awards for work Dr. Singh had nominated.

40.    On April 2, 2025, after Dean Gozal's botched attempt to fire the father, Dr. Singh reassured the father that she remained committed to "co-mentoring and collaborating with students completing their theses." That same day, she told Jane that her commitment to Jane's academic progress remained unchanged and that she remained fully dedicated to co-mentoring and collaborating as Jane completed her thesis.

41.    The promises lasted less than six weeks.

42.    On or about May 15, 2025, Dr. Richard Egleton told Jane that Dean Gozal had ordered Dr. Singh removed as Chair of Jane's dissertation committee. Dr. Egleton was the Associate Dean of Health Sciences Graduate Programs and Chair of the Graduate Council—the administrator with direct responsibility for overseeing the

MD/PhD program, including the transition from PhD to MS3. He would become the Students' primary institutional guide throughout the coming year, providing program guidance, approving committee forms, signing academic plans and evaluation forms, communicating "Steps to Graduation" requirements, and coordinating their return to the medical curriculum.

43. No legitimate academic reason was given for the change.

44. John's committee was hit too. On or about May 14, 2025, Dr. Egleton told John that Dean Gozal had informed him that John's current committee members could no longer serve and that John would have to find a new committee from scratch.

45. John had already completed most of his thesis work. Now he had to reconstitute an entirely new committee, repeat committee-development work, and absorb months of delay and distress.

46. Jane had to do the same kind of work: identify new committee members, meet with each of them, re-review her project, and make changes for a new group of advisors. That included rewriting a grant that prior mentors had already approved and externally submitted.

47. The committee removals were described by other faculty as unprecedented. Based on the record, that description fits. There was no generally applicable policy, no identified academic deficiency, and no comparable action against similarly situated MD/PhD students.

48. Dean Gozal's unjustified removal of the Students' committees delayed their academic progress by at least a year.

**Jane's Research Becomes a Target**

49.     The next turn was more personal.

50.     After Dean Gozal caused Dr. Singh's removal from Jane's committee, Dr. Singh abruptly reversed years of collaboration. She refused to recognize Jane's work. She denied Jane access to data Jane needed to complete her PhD.

51.     The timing supports the inference that Dr. Singh did not act independently, but at least with the knowledge and encouragement of Dean Gozal and others in the leadership structure that had just targeted the family.

52.     On August 12, 2025, Dr. Singh published a paper titled "The Adipose Tissue-Derived Secretome (ADS) in Obesity Uniquely Regulates the Na-Glucose Transporter SGLT1 in Intestinal Epithelial Cells."

53.     The work behind that paper dated back to 2017, when Dr. Singh was a postdoctoral fellow working under the Students' father. Jane began working with Dr. Singh in 2018. In May 2019, Jane presented the foundational work at Digestive Disease Week as first author.

54.     The paper did not materialize without Jane.  Jane had written the vast majority of the paper since 2018 and sent repeated versions to Dr. Singh during that period. Indeed, as late as March 2024, Dr. Singh sent Jane a manuscript draft asking her to review and edit it. Jane later submitted a version ready for submission to a scientific journal.

10

55.    This last draft exchanged before publication was functionally identical to the published version, except for one important thing: Jane's name had been removed.

56.    Less than two weeks later, Dr. Singh emailed the father and copied Dean Gozal and Dr. Gary Rankin, Marshall's Vice Dean of Research. She announced that she would not provide COBRE data to Jane for completion of Jane's PhD.

57.    Despite the fact that Jane had presented the work at numerous conferences and even received awards for it, Dr. Singh suddenly claimed that Jane had contributed nothing to the project.

58.    There was no legitimate academic rationale for that reversal. Dr. Singh's new position contradicted years of collaboration, her April 2025 assurances, the manuscript history, and her own prior statements to Marshall.

59.    Without the research data she had helped generate and without credit for work she had helped author, Jane's PhD timeline was placed in jeopardy.

60.    The message was unmistakable: Dean Gozal's vendetta against the father had migrated directly into the Students' academic futures.

## The Students Completed Every Requirement
## Marshall Gave Them

61.    Despite all of this, Jane and John kept going.

62.    They rebuilt committees. They continued research. They prepared to return from the PhD phase to the third year of medical school.

11

63. On October 30, 2025, Dr. Egleton provided the Students with a document titled "Steps to Graduation." It was not ambiguous. The guidance reflected the longstanding basic structure of Marshall's MD/PhD program: students complete the first two years of medical school, pause the medical curriculum to conduct PhD research, and then return to the third year of medical school—MS3—for clinical rotations. The document laid out the overall path to finishing the PhD, but it also drew a clear line between what was required to graduate with the PhD and what was required simply to return to the medical-school clinical curriculum.

64. For MD/PhD students who were ready to resume MS3 before defending their dissertations, the document said they could stop after the first three steps. The remaining PhD steps—applying for graduation, completing dissertation-related training and paperwork, scheduling and defending the dissertation, and making final submissions—could be completed later, including during a 12-week fourth-year research elective.

65. The three steps needed to return to the clinical curriculum were straightforward.

66. First, the students needed to convey information to Dr. Egleton to make sure all committee members had graduate faculty status qualifications.

67. Second, they needed to have their academic plans approved and signed by all committee members.

12

68. Third, they needed to take and pass the oral exam, with the CBSE (Comprehensive Basic Science Exam) serving as the written exam for MD/PhD students.

69. Those were the return-to-MS3 requirements. John submitted his dissertation committee form on December 1, 2025. Dr. Egleton approved it the next day.

70. John's academic plan was approved by his committee and signed by Dr. Egleton on February 27, 2026. John completed his oral grant-defense examination on March 16, 2026.

71. John's evaluation form was signed by his committee on April 3, 2026, and by Dr. Egleton on April 6, 2026.

72. Jane completed the same required path. Her oral examination grant-defense evaluation form was signed by her committee members and by Dr. Egleton on April 6, 2026.

73. Every administrator and faculty member with actual responsibility for the MD/PhD program confirmed the Students had satisfied the requirements.

74. Consistent with that consensus, Dr. Philippe Georgel, a Professor in the Department of Biological Sciences and chair of John's doctoral committee, confirmed that John had met the established PhD milestones historically required for MD/PhD students to return to the clinical curriculum before formal dissertation defense. Dr. Georgel confirmed the same for Jane.

75.     By that point, the Students had done what the program's written guidance required and what the responsible administrators had told them to do.

76.     Marshall's own conduct then confirmed the same thing: it began treating Jane and John as returning third-year medical students.

**Marshall Treated Jane and John as Returning MS3 Students—Until the Dean Stepped In**

77.     After the Students completed the documented PhD-side requirements, Marshall began treating them as returning third-year medical students.

78.     On March 4, 2026, Dr. Egleton instructed Jane to coordinate her MS3 class schedule with Dr. Nitin Puri, the Chair of Medical Education and Senior Associate Dean of Medical Education, and Robbie Nance, the Director of Medical Education.

79.     On March 10, Robbie Nance sent Jane information about the new MS3 schedule structure.

80.     On April 8, Dr. Puri arranged a clinical-skills refresher for returning MD/PhD students, including John and Jane.

81.     On April 13, Jane and John met with Dr. Puri and Robbie Nance to review expectations for the third year of medical school and formally schedule clerkships.

82.     At that meeting, when both Students told Dr. Puri that they planned on taking the Step 1 exam in the near future, Dr. Puri advised them not to, but rather to take Step 1 after their clinical rotations. He cited other students who had done the same and described it as the norm for MS3 entry.

14

83.    That advice directly contradicted what Dean Gozal would soon claim: that Step 1 had to be completed before the Students could advance to MS3.

84.    Between April 27 and April 30, John attended and completed orientation activities, including scrub training, FIT testing, BLS/ACLS certification, and Cerner EHR training. Jane completed the same orientation activities.

85.    On May 4, John attended Neurology and Psychiatry first-day orientation. On May 5 and 6, he attended Neurology clinics and a lecture with his peers. Jane also began clinical activities in Psychiatry.

86.    By every visible measure, they were on track.

87.    Then the Dean intervened.

### Dean Gozal Changed the Rules
### After the Students Had Already Met Them

88.    On April 14, 2026—eight days after Dr. Egleton signed off on the Students' completed requirements—Dr. Egleton told Jane and John that he had just received an email from Dean Gozal.

89.    According to Dr. Egleton, the Dean now required personal approval before students could transition from the PhD program to the medical program if they had not defended their full thesis.

90.    That requirement had never appeared in the "Steps to Graduation" document. And it had not been communicated to the Students until after they had completed every legitimate step. No legitimate explanation was given for changing the rules at that point.

15

91.    Dr. Egleton was visibly distressed when he delivered the news. He appeared suddenly pale-faced and was unable to make eye contact. He told his administrative assistant, who had witnessed the exchange, that the Students were "being screwed by Gozal." Students who had known Dr. Egleton for over a decade observed that they had never seen him look so uncomfortable or so clearly taken by surprise. His demeanor indicated that the directive had not been his idea, that it conflicted with his understanding of the program, and that he did not support it.

92.    On April 15, Dr. Egleton sent the Students the format for requesting the Dean's approval.

93.    On or around April 21—even though they disputed that the new process was appropriate—the Students submitted the requested information. Dr. Egleton only responded, "Great, thank you." At no point did Dr. Egleton identify any academic deficiency or suggest the Students had not met the requirements under his own guidance.

94.    Shortly thereafter, Dean Gozal stripped Dr. Egleton of his position as Associate Dean for Graduate Education—an appointment Dean Gozal himself had made just a year before. The timing of Dr. Egleton's removal—coming after he had approved the Students' progress, provided the program guidance that contradicted Dean Gozal's new requirements, and visibly struggled to implement directives he did not support—supports the inference that Dr. Egleton was removed at least in part because he would not go along with Dean Gozal's treatment of the Students.

### Dean Gozal Removed the Students from the MD/PhD Program

95.    On May 6, 2026, with Dr. Egleton out of the way, Dean Gozal converted the new Dean-approval requirement into an adverse decision.

96.    He issued Jane an "Academic Standing and Program Progress" letter invoking the authority of a newly-created "Dean's Advisory Council for PhD/MD Transition." The letter did not identify any written policy authorizing the Council. It did not identify any preexisting rule governing its work. It did not explain why the ordinary MD/PhD administrators or the Students' dissertation committees were being displaced.

97.    Nonetheless, the letter stated that "the Council" had determined that Jane had not met the "benchmarks" to advance to the third year of the medical curriculum.

98.    The reasons were more brand new requirements invented by Dean Gozal and only introduced after the Students were already moving into MS3: that Jane had not taken or passed the "Step 1" exam; that her dissertation had not reached the stage necessary for defense; and that the Council believed it was not feasible for her to complete Step 1, Step 2, dissertation defense, and clinical rotations within the remaining timeframe.

99.    The consequences were severe. Jane was placed on a one-year "academic pause." Her tuition support, stipends, and medical insurance were suspended. She was told she could petition to re-enter the medical curriculum as a regular MD

17

student beginning in May 2027—but only if Dean Gozal approved it. And reinstatement into the MD/PhD program would not be available.

100. John received the same type of decision. For him, the May 6 decision removed his advancement to the third year of medical school, removed him from the MD/PhD program, suspended his tuition support and stipend, and left him only the option of petitioning to re-enter as a regular medical student.

101. Contrary to Medical School policy, the May 6 letter afforded no opportunity for appeal.

102. The administrative machinery moved immediately. The Students were pulled off MedHub, the platform used to complete and log required assignments. They were immediately removed from rotation email lists, including lists for future rotations such as surgery.

103. Peers quickly noticed. One classmate asked why the Students were not included on a surgery clerkship elective selection survey.

104. The harm was not theoretical. The Students' ability to complete required work was disrupted. Their reputations among peers, administrators, clerkship directors, and attendings were damaged.

### The May 6 Decision Rested on Requirements That Did Not Exist

105. The May 6 decision was not the product of ordinary academic review.

106. It rested on requirements that conflicted with Dr. Egleton's "Steps to Graduation" guidance, the Students' documented program requirements, and Marshall's historic administration of the MD/PhD transition.

18

107. The "Steps to Graduation" document expressly said students did not need to defend or graduate with their PhD before returning to the clinical curriculum. It identified the CBSE—not the Step 1 exam—as the required written examination. Other program materials confirmed the same.

108. None of the medical student handbooks from 2023 through 2026 mention passing Step 1 as a requirement to transition from the PhD phase into MS3 for the MD/PhD program. The academic bulletin in effect when the Students entered the PhD phase required passing all pre-clinical requirements, which included the CBSE, not Step 1.

109. The May 6 letter also relied on dissertation progress even though Dr. Egleton's written guidance said the Students could return to medical school before defending. It further conflicted with a letter from the Chair of the Graduate Committee stating that both Students had passed all the necessary dissertation progress to return to MS3 year from the PhD program.

110. In short, the May 6 decision was inconsistent with every published policy the Students had followed. It was built on a process and requirements that appeared only after Jane and John had completed the documented path back to MS3.

111. Dr. Egleton's removal made that outcome possible. By eliminating the administrator most familiar with the MD/PhD program and its actual requirements, Dean Gozal removed a potential advocate who could confirm that the Students had satisfied those requirements. The removal also sent a message to other administrators that supporting the Students carried professional risk. And it cleared

19

the way for Dean Gozal to replace ordinary program oversight with the ad hoc "Dean's Advisory Council"—a body whose voting members had no prior involvement with the MD/PhD program and were all appointed by Dean Gozal himself.

## Marshall Partially Reversed Course but Preserved New Requirements

112.    Jane objected immediately.

113.    On May 7, 2026, she told Dr. Puri that there was no published MD/PhD policy requiring Step 1 before MS3, no policy requiring a defensible dissertation before MS3 transition, and no policy requiring Dean approval to move from the PhD phase to the MS3 curriculum.

114.    She reminded Dr. Puri—the same Chair of Medical Education and Senior Associate Dean of Medical Education who had met with the Students on April 13—that he was the one who had advised them to take the Step 1 exam *after* completing MS3 rotations.

115.    Dr. Puri could not identify any written policy supporting Dean Gozal's decision. Instead, he responded that permission to return to the MD curriculum was within the purview of the Vice Dean of Research and the Dean of the School of Medicine. He also described the Dean's Advisory Council as an "ad hoc body" of senior faculty members who advise the Dean.

116.    With no other option, the Students' father contacted the President's office and sought intervention.

20

117. On May 26, Dean Gozal issued a new letter withdrawing certain aspects of the May 6 letter but continuing to assert requirements not found in published policy. The "Program Decision" portion of the May 6 letter was rescinded. The Students would be permitted to continue to MS3. The reference to petitioning to re-enter as a regular MD student beginning in 2027 was no longer applicable.

118. But the May 26 letter left in place many of the onerous additional requirements of the May 6 decision, all of which targeted the Students alone, and none of which were supported by existing policy.

119. Critically, the May 26 letter also threatened that failure to complete Step 1, Step 2, and all PhD requirements by the March 1, 2028 deadline would result in termination of all program tuition support and stipend.

120. Those continuing requirements were baseless and should have been withdrawn.

## Marshall Admitted the Key Premises of Dean Gozal's Decision Were Wrong

121. On June 17, 2026, Marshall denied retaliatory motive. But it acknowledged the essential facts.

122. Marshall acknowledged that the Students' transition to the third year of the medical curriculum should have been permitted.

123. It acknowledged that completion of the Step 1 exam was never a requirement for advancement into the third year of the medical curriculum.

124. Marshall also admitted that the Dean's Advisory Council was an ad hoc committee convened at the Dean's request and, apparently, for the sole purpose of

imposing new requirements on the Students. There was no charter, and no authorization or basis for the committee's existence in any policy.

125. Marshall identified the voting members of the Advisory Council as Dr. Gary Rankin, Vice Dean of Research; Dr. Ali Oliashirazi, a faculty member in Orthopaedic Surgery; Dr. Trupti Joshi, a faculty member in Biomedical Sciences; and Dr. Paulette Wehner, Vice Dean of Education, although Marshall stated that Dr. Wehner did not participate. None of the voting members had prior involvement with the MD/PhD program. All were appointed by Gozal himself.

126. Marshall also said it would not apply the March 1, 2028 deadline for completion of Step 1, Step 2, and all PhD requirements imposed in the May 6 letter.

127. Marshall confirmed that the Students' financial support and program benefits remained intact, reversing the May 6 suspension of tuition and stipends.

128. Marshall further noted that the Students had not submitted the requested plan or attended the requested meeting and that there had been no adverse consequences—suggesting that the deadlines were never necessary to protect academic standards, but merely another mechanism for preserving leverage over the Students.

## Marshall Refused to Protect the Students from Dean Gozal

129. By June 2026, the pattern was clear: on three occasions, Dean Gozal had taken unprecedented action to disrupt the Students' academic progress, stopping only when forced to do so by the University's lawyers and the president himself.

22

130. As a result, the Students requested structural protections to prevent further interference by Dean Gozal with Jane's and John's academic and professional progress.

131. Those protections were straightforward. They requested that Dean Gozal be recused from any direct or indirect involvement in decisions affecting the Students' academic standing, research and publications, evaluations, promotion, disciplinary proceedings, remediation, accommodations, continuation in the program, benefits, graduation, and Deans letters of recommendation.

132. They further requested that supervisory authority over any Dean's letters of recommendation should be transferred to Dr. Shelvy Campbell-Monroe, Senior Associate Dean for Student Affairs, with reporting to the President's office for decisions affecting the Students. Dr. Campbell-Monroe was the most senior member of the Dean's staff who had not participated in Dean Gozal's retaliatory actions to that point.

133. Finally, they asked that matters relating to the Students' PhD progress, completion, and timeline be overseen by their existing committee chair, Dr. Georgel, and their external committee member, Dr. Waddah Alrefai.

134. Though this was the Students' proposal, they expressly stated that they were open to any structure that would protect them from Gozal while preserving the integrity of the program.

135. Despite having taken similar actions in numerous past incidents where an administrator was alleged to have discriminated or retaliated against a student, in this case, Marshall denied the Students' request in all respects.

136. Weeks later, and only when this Complaint was imminent, Dean Gozal reluctantly offered to "recuse" himself from acting as a decision maker in a "disciplinary capacity" with respect to the Students. But that means little, as none of Dean Gozal's prior retaliation involved any disciplinary action against the Students. All of Gozal's prior conduct toward the Students involved targeted, affirmative acts to change the rules and disrupt the Students' progress—the kind of conduct from which the Students seek protection in the future, and which Marshall steadfastly refuses to provide.

137. Marshall says the Students will remain subject to the same expectations, graduation requirements, and policies applicable generally to MD/PhD program participants. But that misses the point. The problem was never the published and generally applicable rules. The problem was Dean Gozal—the same decisionmaker who disbanded the Students' committees, created an unauthorized council, imposed nonexistent requirements, and reversed his actions only under executive pressure—remains in a position to interfere again.

138. Marshall's refusal to implement safeguards leaves Jane and John exposed to the same threat.

**Dean Gozal Had Already Retaliated
Against Other Students Who Complained**

139.    Marshall's refusal to act was not a matter of ignorance. The University had reason to know that Dean Gozal would retaliate against students who challenged him, because he has done it before.

140.    In late 2024, Marshall received multiple, detailed letters from a group of physician-assistant students within the Joan C. Edwards School of Medicine. The students alleged deficiencies in their PA program and reported harassment of female students by male professors. The students specifically invoked Title IX and asked the University for help.

141.    Dean Gozal responded not by addressing the complaints, but by further harassing and threatening the students who raised them.

142.    When female students raised these issues with Dean Gozal, he stated that the sexual harassment was merely "training by fire." He told the students that, as a result of his religious beliefs, he believed women should not work outside the home or complain. He warned that if the students "kept this up," their professors would fail them. And he told them that he had received Title IX complaints against him before, and that he had fired the women who made them.

143.    Upon information and belief, Marshall never initiated a Title IX complaint against Dean Gozal in response to the PA students' complaints and never took any disciplinary action against him.

144. The PA students were ultimately intimidated into dropping their complaints after being told that continuing to seek help would harm their program and diminish the value of their degrees.

145. Thus, by the time Jane and John asked Marshall to insulate them from Dean Gozal, the University already had concrete evidence that Dean Gozal had a history of responding to student complaints with threats, retaliation, and sex-based hostility—and that he had succeeded in silencing complainants. Marshall's refusal to protect the students was thus not merely negligent. It was a decision to leave students exposed to a known retaliator, with full knowledge of what he had done before.

### Without Court Intervention, the Students Remain Exposed to Retaliation

146. Jane and John have already suffered educational disruption, reputational harm, emotional distress, exacerbation of underlying medical conditions, and uncertainty about their benefits and continued program status.

147. The May 6 decision interrupted them after they had already begun clinical activities, including orientation, clinical assignments, MedHub participation, and rotation communications.

148. Peers and administrators noticed when the Students were removed from communications, causing reputational harm.

149. Jane's research progress was separately harmed by her mentor's removal, denial of access to research data, and publication of her work without authorship credit.

26

150. John's PhD progress was harmed when Dean Gozal forced him to reconstitute his committee and repeat committee-development work.

151. Although Marshall reversed the most extreme parts of Dean Gozal's May 6 action, it has refused to insulate the Students from Dean Gozal or his proxies.

152. Indeed, Marshall has continued to subject the Students to ongoing interference with their education. Since June 30—the day the father's employment ended—Marshall has taken control of and refused to allow the Students to access critical records, supplies, and equipment necessary to further their PhD research. Even if access were restored tomorrow, the gap in the chain of custody over critical research materials may permanently impair the Students research careers.

153. The Students therefore remain at risk that Dean Gozal will interfere again with their academic standing, research, publications, evaluations, benefits, graduation, Dean's letters, or future professional opportunities.

154. Jane and John now ask the Court to repair what can be repaired, compensate what has already been lost, and stop Dean Gozal from using their academic futures as leverage in a fight that should never have been theirs.

## JURISDICTION AND VENUE

155. This Court has subject-matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331 because those claims arise under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

156. This Court has supplemental jurisdiction over Plaintiffs' state-law tortious interference claim under 28 U.S.C. § 1367 because that claim arises out of

the same case or controversy as Plaintiffs' federal claims and derives from a common nucleus of operative fact.

157. This Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

158. This Court has personal jurisdiction over Dean Gozal because he resides in West Virginia, is employed within this District, and the conduct giving rise to Plaintiffs' claims occurred while he was acting in his official capacity within this District.

159. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including in Cabell County, West Virginia, where Marshall University's Joan C. Edwards School of Medicine is located and where Dean Gozal took the actions described above.

160. Venue is proper in the Huntington Division of this District under 28 U.S.C. § 129(b) because Cabell County, West Virginia, where Marshall University is located and where the conduct at issue occurred, and Putnam County, West Virginia, where Jane and John reside, are both located within the Huntington Division.

28

**CLAIMS FOR RELIEF**

**COUNT I**

**42 U.S.C. § 1983 — First Amendment Retaliation (Familial Association)
Against Dean Gozal in
His Individual and Official Capacities**

161. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth here.

162. The Students' father engaged in protected activity when he reported unauthorized and potentially hazardous radiological research involving human and animal samples, opposed Marshall's treatment of him, asserted claims for breach of contract, discrimination, retaliation, and interference with federally funded research, and demanded that Marshall stop retaliating against him and his family.

163. Dean Gozal knew of that protected activity and of the father's familial relationship with Jane and John.

164. Jane and John have a constitutionally protected relationship with their father, including the right not to be punished by a state official because of their close familial association with him or because of protected activity undertaken by him.

165. Acting under color of state law, Dean Gozal retaliated against Plaintiffs by targeting the academic structure they needed to complete the PhD portion of the MD/PhD program, including causing or directing the removal of their dissertation committees and forcing them to repeat committee-development work without any legitimate academic basis.

29

166. Dean Gozal further retaliated by imposing a new Dean-approval requirement after Plaintiffs had satisfied the documented return-to-MS3 requirements, convening an unauthorized Dean's Advisory Council, and relying on newly invented requirements that conflicted with the policies and guidance Plaintiffs had followed.

167. Dean Gozal further retaliated by causing Plaintiffs to be removed from advancement to MS3, removed from the MD/PhD program, suspended from tuition support and stipends, removed from MedHub and rotation communications, and exposed to reputational harm among peers, administrators, clerkship directors, and attendings.

168. Dean Gozal's actions would deter a person of ordinary firmness from engaging in protected speech, petitioning activity, and association, and they did in fact chill Plaintiffs and their family by making clear that any resistance to Dean Gozal could be answered through Plaintiffs' academic futures.

169. The causal connection is shown by the timing, the absence of any generally applicable policy supporting Dean Gozal's actions, the displacement of ordinary MD/PhD administrators, the later rescission of the Dean's Advisory Council's decision, and Marshall's admission that Step 1 was not required for advancement into the third year of the medical curriculum.

170. As a direct and proximate result of Dean Gozal's conduct, Plaintiffs suffered educational disruption, reputational harm, emotional distress, delay and uncertainty in their MD/PhD progress, threatened loss of tuition support and

stipends, and continuing exposure to retaliation in future evaluations, benefits, graduation decisions, and Dean's letters.

171.   Plaintiffs are entitled to declaratory relief, prospective injunctive relief against Dean Gozal in his official capacity, compensatory and punitive damages against Dean Gozal in his individual capacity, costs, reasonable attorneys' fees under 42 U.S.C. § 1988, and all other appropriate relief.

## COUNT II

**42 U.S.C. § 1983 — Procedural Due Process Against Dean Gozal in His Individual and Official Capacities**

172.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth here.

173.   Plaintiffs had protected interests in their continued enrollment and good standing in the MD/PhD program, continued receipt of tuition support and stipends under the written program terms, continued access to the clinical curriculum after satisfying the documented return-to-MS3 requirements, and fair application of Marshall's published and generally applicable policies. Under Plaintiffs' admission and funding agreements, continued MD/PhD status, tuition support, stipend, and insurance were guaranteed so long as Plaintiffs remained in academic and professional good standing and satisfied the specifically stated progress requirements. Those agreements did not reserve unfettered discretion to terminate those benefits or condition MS3 transition on requirements adopted after Plaintiffs satisfied the stated criteria.

31

174. Those interests are established by Marshall's offer letters, program documents, written "Steps to Graduation" guidance, and the course of dealing between Plaintiffs and Marshall's responsible administrators. Plaintiffs allege those facts not as a standalone state-law contract or quasi-contract claim in this action, but as evidence of their protected interests, Defendants' notice of those interests, the pretextual and arbitrary nature of Dean Gozal's conduct, Plaintiffs' reasonable reliance, and the need for prospective relief to remedy ongoing violations of federal law. Plaintiffs reserve all state-law contract and quasi-contract remedies available in the appropriate state forum.

175. Plaintiffs satisfied the documented return-to-MS3 requirements, were approved by the responsible MD/PhD administrators and faculty, scheduled clerkships, completed required orientation activities, and began clinical activities before Dean Gozal's May 6 decision.

176. Dean Gozal deprived Plaintiffs of those interests by removing or attempting to remove their MS3 advancement, MD/PhD status, tuition support, stipends, clinical-system access, and rotation communications.

177. Dean Gozal did so without constitutionally adequate process, including without fair notice of the requirements being applied, without a neutral and authorized decisionmaker, without a meaningful opportunity to be heard, without a disclosed policy authorizing the Dean's Advisory Council, and without a clear appeal mechanism.

32

178.    The later partial rescission did not cure the due process violation because Marshall continued to preserve new requirements, refused to implement safeguards against Dean Gozal's future involvement, and left Plaintiffs exposed to renewed interference by the same decisionmaker or his proxies.

179.    Plaintiffs are entitled to declaratory relief, prospective injunctive relief, compensatory and punitive damages against Dean Gozal in his individual capacity, costs, reasonable attorneys' fees under 42 U.S.C. § 1988, and all other appropriate relief.

## COUNT III

**42 U.S.C. § 1983 — Equal Protection and Class-of-One Treatment Against Dean Gozal in His Individual and Official Capacities**

180.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth here.

181.    Plaintiffs were intentionally treated differently from similarly situated MD/PhD students when Dean Gozal imposed requirements and processes uniquely on them, including personal Dean approval, review by an ad hoc Dean's Advisory Council, Step 1 as a supposed prerequisite to MS3, dissertation-defense readiness as a supposed prerequisite to MS3, and a March 1, 2028 deadline for completion of Step 1, Step 2, and all PhD requirements.

182.    There was no rational basis for treating Plaintiffs differently because Plaintiffs had satisfied the published return-to-MS3 requirements, responsible administrators and faculty had approved their progress, and Marshall later

33

acknowledged that Step 1 was not required for advancement into the third year of the medical curriculum.

183. Dean Gozal's differential treatment of Plaintiffs was irrational, arbitrary, malicious, and motivated by personal animus and retaliation for protected activity by their father and their family.

184. Plaintiffs are entitled to declaratory relief, prospective injunctive relief, compensatory and punitive damages against Dean Gozal in his individual capacity, costs, reasonable attorneys' fees under 42 U.S.C. § 1988, and all other appropriate relief.

## COUNT IV

**Tortious Interference Against Dean Gozal in His Individual Capacity**

185. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth here.

186. Plaintiffs had valid contractual, business, academic, and professional expectancies in their continued MD/PhD status, tuition support, stipends, MS3 clinical progression, PhD completion, research and publication opportunities, faculty evaluations, graduation, Dean's letters, and future residency and professional opportunities.

187. Dean Gozal knew of those expectancies and intentionally interfered with them by directing or causing the removal of dissertation committees, obstructing Plaintiffs' return to MS3 after they satisfied the documented

34

requirements, using an unauthorized ad hoc council, and causing the May 6 adverse actions.

188. Dean Gozal's interference was improper, unjustified, malicious, and outside any legitimate academic or institutional privilege because it was retaliatory, contrary to published and generally applicable policies, and later partially rescinded after Marshall acknowledged the essential premises were wrong.

189. As a direct and proximate result of Dean Gozal's interference, Plaintiffs suffered educational disruption, reputational harm, emotional distress, delay in academic progress, uncertainty regarding benefits and program status, and injury to their future professional opportunities.

190. Plaintiffs are entitled to compensatory damages, punitive damages, costs, and all other appropriate relief.

## REQUEST FOR PROSPECTIVE RELIEF

### Injunctive Relief Against Defendant Gozal

191. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth here.

192. As a result of the violations of Plaintiffs' Constitutional rights, Plaintiffs are entitled to declaratory and injunctive relief.

193. An actual and continuing controversy exists because Dean Gozal or his proxies remain positioned to interfere again with Plaintiffs' academic standing, research, publications, evaluations, benefits, graduation, Dean's letters, and future professional opportunities.

35

194.    Plaintiffs have no adequate remedy at law for the continuing threat of retaliation because money damages cannot fully repair lost clinical training time, reputational injury in a professional school, tainted evaluations, compromised Dean's letters, delayed graduation, or interference with future residency and professional opportunities.

195.    Plaintiffs seek an order requiring Defendant Gozal to apply only published and generally applicable MD/PhD requirements to Plaintiffs, to preserve Plaintiffs' MD/PhD status, tuition support, stipends, insurance, MedHub access, clinical rotations, rotation communications, and all other program benefits unless and until a neutral decisionmaker determines otherwise under generally applicable policies and constitutionally adequate procedures.

196.    Plaintiffs seek an order prohibiting Dean Gozal from any direct or indirect involvement, including through proxies or subordinates, in decisions affecting Plaintiffs' academic standing, research and publications, evaluations, promotion, disciplinary proceedings, remediation, accommodations, continuation in the program, benefits, graduation, and Dean's letters of recommendation.

197.    Plaintiffs seek an order prohibiting Defendant Gozal from using the May 6 decision, the Dean's Advisory Council's findings, or any similar ad hoc determination in Plaintiffs' future evaluations, promotion decisions, disciplinary records, professionalism records, Dean's letters, residency-related communications, or other academic or professional records.

36

198.    Plaintiffs seek an order requiring that matters relating to their PhD progress, completion, and timeline be overseen by their existing committee leadership or by other neutral officials with relevant MD/PhD experience, outside Dean Gozal's influence.

199.    Plaintiffs further seek costs, reasonable attorneys' fees where authorized by law, and all other legal and equitable relief the Court deems just and proper.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Jane Roe and John Doe respectfully request that this Court enter judgment in their favor and against Defendant David Gozal, and grant the following relief:

(a) A declaratory judgment that Defendant's conduct, as alleged herein, violated Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution;

(b) Preliminary and permanent injunctive relief as set forth in the Request for Prospective Relief above;

(c) Compensatory damages against Defendant Gozal in his individual capacity, in an amount to be determined at trial;

(d) Punitive damages against Defendant Gozal in his individual capacity, in an amount to be determined at trial;

(e) Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and other applicable law;

(f) Pre-judgment and post-judgment interest as allowed by law; and

(g) Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable pursuant to Rule 38 of the Federal

Rules of Civil Procedure.

<div style="margin-left: 40%;">

**JANE ROE and JOHN DOE**,
By Counsel:

/s/ Ryan McCune Donovan
Ryan McCune Donovan (WVSB #11660)
J. Zak Ritchie (WVSB # 11705)
Maureen Gleason (WVSB # 14452)
Hissam Forman Donovan Ritchie PLLC
P.O. Box 3983
Charleston, WV 25339
681-265-3802 *office*
304-982-8056 *fax*
rdonovan@hfdrlaw.com
zritchie@hfdrlaw.com
mgleason@hfdrlaw.com

</div>